**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FILED

JAN 1 5 2014

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| JENNIFER GREEN<br>Plaintiff,<br><br>v.<br><br>TEDDIE KOSSOF SALON & DAY SPA,<br>Defendant, | 13 cv 6709<br>Judge Joan B. Gottschall<br>Magistrate Arlander Keys |

### PLAINTIFF'S REPLY TO DEFENDANT'S MOTION TO DISMISS

NOW COMES the Plaintiff, Jennifer Green, pro se, and respectfully submits her Reply to the

Defendant's Motion to Dismiss. In support thereof, Plaintiff states as follows:

### Statement of Facts

Plaintiff filed with and was in compliance with the E.E.O.C. through their investigative process

until she was granted her "Notice of Right To Sue". Plaintiff, obtained assistance through the Pro Se

Assistance Program for the Northern District of Illinois, Eastern Division due to the inability to retain

counsel. Plaintiff has no legal experience. Plaintiff met with three different people with the Pro Se

Assistance program through the period of obtained assistance. Each of the people with the program

Plaintiff met with said her complaint was adequate. However, every other appointment the appointed

individual would say it had to be written differently. As such, Plaintiff would edit it to each of their

specifications and by the third revision, it was the final day for Plaintiff to file. Plaintiff was, however,

told the final complaint was "very well written "and "detailed ", and there should not be any issues

regarding format, given her lack of legal knowledge and inexperience with Law Practice. Plaintiff was

also given a vague outline by the Pro Se Assistance program of what was expected in her complaint.

*see exhibit 1: Summary of Instructions for Filing a Civil Case.* Using the materials and

1

guidance given by the Pro Se Assistance Program, Plaintiff filed her complaint September 18, 2013,

against her former employer, Teddie Kossof Salon & Day Spa.

## I. Defendants motion to dismiss falls short of entitling them to dismissal pursuant to Fed. R. Civ. P. 12(b)(6)

When evaluating on "a motion to dismiss, the court accepts Plaintiff's allegations as true and

draws all reasonable inferences in Plaintiff's favor." Pendolino v. BAC Home Loan Servicing, LP, 2011

WL 3022265 (N.D. Ill. 2011), (citing) Bonte v. U.S. Bank, N.A., 624 F.3d 461, 463 (7th Cir. 2010).

In the Defendants motion to dismiss, they begin by attempting to set a legal standard through precedent

of cases that are immediately distinguishable from the case *sub judice*. None of the cases the defendant

places their misguided reliance on involved a *pro se* litigant. "Pleadings must be construed so as to do

justice." Fed. R. Civ. P. 8(e). "a *pro se* complaint, however inartfully pleaded, must be held to less

stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94

(2007), see also Luevano v. Wal-Mart Stores, Inc., 722 F.3d 1014, 1027 (7th Cir. Ill. 2013). As

such, in order to state a claim in federal court, a *pro se* litigant must: "explain what each defendant did

to him or her; when the defendant did it; how the defendant's action harmed him or her; and, what

specific legal right the plaintiff believes the defendant violated. After all, these are, very basically put, the

elements that enable the legal system to get weaving - permitting the defendant sufficient notice to begin

preparing its defense and the court sufficient clarity to adjudicate the merits." Nasious v. Two Unknown

B.I.C.E. Agents, 492 F.3d 1158, 1163 (10th Cir. Colo. 2007). Although in much greater detail than

what is required by Fed. R. Civ. P. 8, the plaintiff in this case specifically addressed in her complaint: 1)

what each defendant did to her; 2) When the defendant engaged in the conduct complained of; 3) and

the specific legal right the plaintiff believes the defendant in this matter violated. The complaint filed by

plaintiff, although not artfully drafted contains numerous facts that contain all the essential elements and

2

the reasonable inference from the facts alleged that violations of the ADA occured. As such, dismissal should not be granted to the Defendants for the above and foregoing issues presented in this Reply to Defendants Motion to Dismiss. In addition, Plaintiff requests, if required to amend her complaint, to be appointed counsel as a poor person, even if for the limited role of amending her meritorious complaint to cure any procedural defects.

## II. Defendant erroneously concludes that "lumbar radiculopathy" is not a disability under the ADA

In the defendants motion, counsel uses quotation marks ("") to denote several provisions under the Code of Federal Regulations. However, nothing the defendant quoted is language of the relevant C.F.R. For example, the defendant quotes: "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities' 29 C.F.R. § 1630.2(j)(3)(i)". See Defendants Motion to Dismiss, at p. 4. However, the plain language of the C.F.R states: "(3) Predictable assessments --(i) The principles set forth in paragraphs (j)(1)(i) through (ix) of this section are intended to provide for more generous coverage and application of the ADA's prohibition on discrimination through a framework that is predictable, consistent, and workable for all individuals and entities with rights and responsibilities under the ADA as amended." 29 C.F.R. § 1630.2(j)(3)(i). It is unclear if Defendant intended to cite a case they were paraphrasing or quoting. However the language they "quote" is not the language of the provisions they cited and in fact cite to the EEOC's intent of providing for a more generous coverage and application of the ADA's prohibition on discrimination. 29 C.F.R. § 1630.2(j)(3)(i).

Analysis of the plain language of the relevant C.F.R. defines what a disability is, not the

3

defendants patently false characterization of the Plaintiff's "Lumbar Radiculopathy" or other medical conditions for that matter. In order to establish a prima facie case of discrimination in violation of the ADA, the plaintiff must prove that (1) [s]he has a disability; (2)[s]he is a qualified individual; and (3) [s]he was subjected to unlawful discrimination because of his [her] disability. Holbrook v. City of Alpharetta, 112 F.3d 1522, 1526 (11th Cir. Ga. 1997). "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations." Chevron, U.S.A., Inc. v. NRDC, Inc., 467 U.S. 837, 844 (1984). Under the provisions of 29 C.F.R. § 1630.2 et seq., the condition, "Lumbar Radiculopathy", would be considered a disability under the ADA. Definition of 'disability.' "In general. Disability means, with respect to an individual: (i) A *physical* or mental *impairment* that *substantially limits one or more* of the *major life activities* of such individual; (ii) *A record of such an impairment*; or (iii) Being regarded as having such an impairment as described in paragraph (l) of this section. This means that the individual has been subjected to an action prohibited by the ADA as amended because of an actual or perceived impairment that is not both 'transitory and minor.' An individual may establish coverage under any one or more of these three prongs of the definition of disability, i.e., paragraphs (g)(1)(i) (the 'actual disability' prong), (g)(1)(ii) (the 'record of' prong), and/or (g)(1)(iii) (the 'regarded as' prong) of this section. 29 C.F.R. § 1630.2(g) et seq. (emphasis added). The medical records containing the Plaintiff's: Prescriptions, general physician and neurology specialist reports, MRI, diagnosis/prognosis were a part of the EEOC file and should now be a part of the file of this case since it was forwarded by the EEOC. Under the definition of physical impairment, the C.F.R. states: "*Any physiological disorder or condition*, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as *neurological, musculoskeletal*, special sense organs,

4

*respiratory* (including speech organs), cardiovascular, *reproductive*, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and *endocrine*." 29 C.F.R. § 1630.2(h)(1) (emphasis added). "In determining whether an individual has a disability under the 'actual disability' or 'record of' prongs of the definition of disability, the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve. *For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in the general population.*" 29 C.F.R. § 1630.2(j)(4)(iii) (emphasis added). The C.F.R. defines "Major life activities— (1) In general. *Major life activities include, but are not limited to*: (i) *Caring for oneself, performing manual tasks*, seeing, hearing, eating, *sleeping, walking, standing, sitting, reaching, lifting, bending*, speaking, *breathing*, learning, reading, *concentrating, thinking*, communicating, interacting with others, *and working*." ." 29 C.F.R. § 1630.2(i)(1) et seq. (emphasis added). Additionally, the C.F.R. goes on to list other factors: "The operation of a major bodily function, including functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, *neurological*, brain, *respiratory*, circulatory, cardiovascular, *endocrine*, hemic, lymphatic, *musculoskeletal, and reproductive functions*. The operation of a major bodily function includes the operation of an individual organ within a body system." 29 C.F.R. § 1630.2(i)(1)(ii) (emphasis added). "The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, *not* whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether impairment "substantially limits" a major life activity *should not* demand extensive analysis." 29

C.F.R. § 1630.2(j)(1)(iii) (emphasis added). "The term 'substantially limits' *shall be construed broadly in favor of expansive coverage*, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard. 29 C.F.R. § 1630.2(j)(1)(i) (emphasis added). "An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section. 29 C.F.R. § 1630.2(j)(1)(ii). "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 29 C.F.R. § 1630.2(j)(1)(vii). "An impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment." 29 C.F.R. § 1630.2(j)(1)(viii). "There are many patients who suffer from radiculopathy, characterized by *spontaneous pain*, *weakness and numbness in the buttock, leg, and foot and difficulty in controlling specific muscles*. Radiculopathy can occur in any part of the spine, most commonly in the lower back (lumbar radiculopathy) and neck (cervical radiculopathy) and not in the middle of the spine (thoracic radiculopathy). *Radiculopathy is caused by compression or irritation of the spinal nerves*. This can be due to mechanical compression of the nerve by a disc herniation or thickening of surrounding ligaments. Other causes of radiculopathy include diabetes, which can decrease the normal blood flow to the spinal nerves. Inflammation from trauma can also lead to radiculopathy from direct irritation of the nerves." Takiguchi et al. Molecular Pain 2012, 8:31 http://www.molecularpain.com/content/8/1/31. little is known about the degree of radiculopathy at the various levels of nerve injury. Takiguchi. Plaintiffs impairments are episodic and when Plaintiffs

condition does "flare up" it leaves her immobile and bed ridden at times; other times she needs a cane in

order to even stand on her own or walk; and quite often with the heavy narcotics/ medications she is

prescribed, she can alleviate at least the pain (this remedy however does not (1) cure muscle weakness,

involuntary muscle spasms, or any other effect other than the pain caused from the lumbar

radiculopathy; and (2) puts her in an intoxicated state from her prescriptions that she is unable to

perform many vital life functions. It is quite clear from the medical records in this case that the Plaintiff

has suffered serious damage to her back that could possibly be repaired only by a potentially dangerous

surgical procedure, not your average characteristics as if she were complaining about mere pain as the

Defendant seeks to make the Plaintiffs condition to be. "An individual has a record of a disability if the

individual has a history of, or has been misclassified as having, a mental or physical impairment that

substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1). "Whether an individual

has a record of an impairment that substantially limited a major life activity shall be construed broadly to

the maximum extent permitted by the ADA and should not demand extensive analysis. An individual will

be considered to have a record of a disability if the individual has a history of an impairment that

substantially limited one or more major life activities when compared to most people in the general

population, or was misclassified as having had such an impairment. In determining whether an

impairment substantially limited a major life activity, the principles articulated in paragraph (j) of this

section apply." 29 C.F.R. § 1630.2(k)(2). "Except as provided in § 1630.15(f), an individual is

'regarded as having such an impairment' if the individual is subjected to a prohibited action whether or

not that impairment substantially limits, or is perceived to substantially limit, a major life activity.

Prohibited actions include but are not limited to refusal to hire, demotion, *placement on involuntary*

*leave, termination*, exclusion for failure to meet a qualification standard, *harassment, or denial of*

*any other term, condition, or privilege of employment*." ." 29 C.F.R. § 1630.2(l)(1) (emphasis added). "Except as provided in § 1630.15(f), an individual is 'regarded as having such an impairment' any time a covered entity takes a prohibited action against the individual because of an actual or perceived impairment, even if the entity asserts, or may or does ultimately establish, a defense to such action." 29 C.F.R. § 1630.2(l)(2) (emphasis added). "A covered entity is required, absent undue hardship, to provide a reasonable accommodation to an otherwise qualified individual who meets the definition of disability under the 'actual disability' prong (paragraph (g)(1)(i) of this section), or 'record of' prong (paragraph (g)(1)(ii) of this section), but is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the "regarded as" prong (paragraph (g)(1)(iii) of this section)." 29 C.F.R. § 1630.2(o)(4). The original. The original complaint along with the medical documentation on file and the EEOC report on file positively affirm that the Plaintiff is "disabled" under the act. Additionally, her detailed complaint adequately put the Defendants on notice of the facts that the Plaintiff intends to prove to a jury at trial. In addition, the EEOC granted this plaintiff permission to bring her suit; if her complaint did not fall under the ADA standards, the EEOC should have sua sponte dismissed her claim against the Defendant.

### III. **Plaintiff's complaint sufficiently stated facts that a jury could reasonably conclude violations occurred**

As stated in the foregoing paragraphs, the Plaintiff, in her complaint, specifically laid out facts that could entitle her to relief. Here the Defendant filed a motion simply to try to get the plaintiff to amend simply in the hopes she would omit vital information, not for clarification. In their motion, they basically attempt to hold her to the standard expected of a licensed practitioner of the law and to lay out an elements test for them and then hold their hand through the explanation when *any* member of their

legal team has more legal knowledge than the Plaintiff. It is, as stated earlier, sufficient that she laid out

the factual elements supporting the claim and what laws she believes were violated, which she did, so

that the Defendant could prepare a defense. She specifically argued the discrimination towards her

neurological and musculoskeletal impairment, "lumbar radiculopathy", that was the primary cause of the

events that led to this claim and is a "disability" in her case under all 3 prongs of the disability definition

contained in 29 C.F.R. § 1630.2(g) et seq. (For example, if this were say a simple "slip and fall case" it

would be sufficient if it were alleged that: Person A, went in to the store owned by Person B while

Person B was the only one working at the business and person A slipped on a wet floor where there

was no wet floor sign and no warning. If used in this context, the Defendants motion would be saying

because the *pro se* litigant did not "spell out" the elements for a personal injury tort that the pro se

litigants complaint should be dismissed although it factually established, even without discovery, that

violations took place. Even under the gender discrimination Plaintiff alleged, the defendant makes the

claim that it must fail because it does not involve a disproportionate result that happened to a male.

However, the final medical condition (ovarian cyst [also a disability under the C.F.R.]) the Plaintiff had

up to her termination can only be suffered by a female. Assuming *arguendo,* that the defendant did

attempt to make all of the accommodations that he will most certainly try to falsely certify were done, it

can be easily concluded from the facts in the complaint, that he (Alan Kossof) as a male, gave the

Plaintiff more leniency when it came to a gender neutral medical condition, and yet treated a condition

that can only affect females as if it were insignificant. This is not a case where insufficient factual matter

is alleged. Even throughout the EEOC investigation, the Defendant explicitly admitted that the Plaintiffs

termination was due to "too many medical problems" How the Defense cannot prepare for a

discrimination case when the Defendant admitted discrimination to the EEOC because of a pleading file

by a non lawyer that was factually sufficient is unclear. Especially since the Defendant has not

established "beyond a doubt" that the Plaintiff can prove no set of facts in support of his claim which

would entitle him to relief, his motion to dismiss should be denied. In addition, the Defendants request

for a more definite statement should also be denied. " First, undue length alone ordinarily does not

justify the dismissal of an otherwise valid complaint. Where a complaint does not comply with Rule 8's

mandate of 'a short and plain statement of the claim' but nevertheless puts the Defendant on notice of the

Plaintiff's claims, dismissal is inappropriate 'merely because of the presence of superfluous matter.'"

Stanard v. Nygren, 658 F.3d 792, 797 (7th Cir. Ill. 2013). Although lengthy, Plaintiffs complaint

alleges numerous acts by the Defendant that support her claim and the requisite standards of proof for

the discriminatory acts she descriptively alleged. The defendant purports that since the Plaintiffs

complaint was long and contained citations to cases factually similar to her claims that it is "vague" or

"unintelligible" . However, their own motion defeats their simple argument that the Plaintiffs complaint is

unintelligible. Defendant cites to the Plaintiffs "Lumbar Radiculopathy" with no problem as not being a

"disability under the ADA" for the purposes of their defense of a dismissal pursuant to their motion to

dismiss. The Defendants also clearly made claims that they were entitled to a motion to dismiss because

of "failure to state a claim." However, if the plaintiffs complaint was truly unintelligible, entitlement to

relief pursuant to rule 12(e), no grounds for the Defenses allowed through a motion should exist

especially where their motion for dismissal for failure to state a claim is denied as should be in this

matter. How they go from one hand saying they cannot understand the complaint in order to defend it,

yet seek dismissal for specified grounds they themselves cited to in the complaint is unclear. However

since the Plaintiff, *pro se*, is entitled to leniency when analyzing their pleading, the Defendants motion for

more definite statement should also be denied.

WHEREFORE, Plaintiff prays this honorable court deny Defendants motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and deny their motion for a more definite statement pursuant to Fed. R. Civ. P. 12(e).

Plaintiff, pro se
Jennifer S. Green

Moonchild1182@gmail.com
847-275-8430

## Summary of Instructions for Filing a Civil Case

| Document | General Information | Number of Copies Required |
|---|---|---|
| **Complaint** | List all plaintiffs and defendants in the caption the top left of the complaint. State your case in your own words, using additional pages if you need them. Your signature, address, and telephone number must appear on the last page of your complaint. Exhibits may be attached to your complaint. | You must provide an original, 1 copy for the assigned judge, and 1 copy for *each* defendant named in your complaint. If you are suing the federal government or one of its agencies, you need to provide 3 extra copies. |
| **Civil Cover Sheet (JS-44)**<br><br>This is a form used by the Court in preparing the docket for your case. | Instructions for completing this form appear on the reverse side of the JS-44. | Only the original is required. |
| **Appearance**<br><br>The appearance form is used to designate who will be acting as the attorney for a party. | If you do not have an attorney and will be proceeding without counsel, fill in the appearance form in accordance with the instructions found on the reverse side of the form, supplying your name and address. Add the words "pro se" next to your name. | Only the original is required. |
| **Filing fees** | There is a fee of $350 for the filing of a civil case other than a writ of habeas corpus. If you are unable to afford the fee, see the information below about in forma pauperis petitions. | NA |
| **In Forma Pauperis Petition**<br><br>This petition is used by a plaintiff who requests approval by the court for a civil case to proceed without the prepayment of the filing fee. | Complete all appropriate sections of the petition, sign and date. | You must provide an original and 1 copy for the assigned judge. |

Exhibit 1 (7 of 22)

| | | |
|---|---|---|
| **Motion for Appointment of Counsel**<br><br>This motion is a request that the court appoint an attorney. | Complete the motion form in accordance with the instructions attached to the form. | You must provide an original and 1 copy for the assigned judge. |
| **Summons** | Complete the original and one copy for service to each defendant. Your own name and address should appear under the heading labeled "Plaintiff's Attorney." | You must provide an original and 1 copy for *each* defendant named in your complaint. If you are suing the federal government or one of its agencies, you need to provide 3 extra copies. |

NorthShore Clinical Medical History

Name: Jennifer S Green | DOB: 1/1/1982 | MRN: 007312028 | PCP: MOHITMEET SINGH, MD

## Past Medical History

**Information concerning your health from outside the NorthShore University HealthSystem is not necessarily reflected here. Your physician may be able to update your information to ensure accuracy.**

**If you feel any of the information is inaccurate, please** message your doctor's care team **so that your record can be updated accordingly.**

### Medical History

| Diagnosis | When |
|---|---|
| Unspecified Asthma | |
| Concussion, Unspecified | 2002 |
| Other And Unspecified Ovarian Cyst | |
| Myoclonic Seizure | |
| Lumbar Radiculopathy, Chronic | |

### Surgical History

| Procedure | When |
|---|---|
| Plastic Surgery, Neck | |
| Removal Of Ovarian Cyst(s) | 1998 |
| Repair Hernia Inguinal | 2011 |

### Family Medical History

| Relationship | Health Issue | Comment |
|---|---|---|
| Other | Cancer | Adopted |
| | Heart | unknown heart diseae |

### Social History

| | |
|---|---|
| **Smoking Tobacco Use:** | Former Smoker |
| **Smoking Tobacco Types:** | Cigarettes |
| **Packs / Day:** | |
| **Years Smoked:** | .5 |
| **Smoking Tobacco Quit Date:** | 3/6/2010 |
| **Smokeless Tobacco Use:** | |

Never Used

• **Smokeless Tobacco Types:**

**Alcohol Use:**     Yes

**Ounces / Week:**     1

**Family Status**

## You have no family status on file.

MyChart® licensed from Epic Systems Corporation, © 1999 - 2012. Patents pending.

Patient Name:
Green, Jennifer S

Sex
Female

1/1/1982

## Progress Notes Info

| Author | Note Status | Last Update User | Last Update Date/Time |
|---|---|---|---|
| Beckerman, Mihail, MD | Signed | Beckerman, Mihail, MD | 3/6/2013 1:02 PM |

## Progress Notes

S: pain increased. Tramadol not as effective as in the past. We tried gabapentin and cymbalta but had side effects. LBP with radiation to LE
BP 116/63 | Pulse 66 | Resp 17 | Ht 5' 6" (1.676 m) | Wt 145 lb (65.772 kg) | BMI 23.40 kg/m2 | SpO2 98% | LMP 01/25/2013
aaa x 3
Gait nl
cardiopulm stable
A/P: lumbar radiculopathy. Increase tramadol to 100mg. Add topamax.
> 50% of the time was spent in medical counselling and/or discussion of test results, medical condition and treatment options. Face to face time spent was  15 minutes.

For pt's employer,
Pt is being treated by me for lumbar radiculopathy. She is on tramadol and topamax.
She experiences intermittent exacerbations but once pain subsides she can work without any restrictions.
MIHAIL BECKERMAN, MD

## Chart Review Routing History

| Name | Address/Fax | Phone | Method | Report | Sent By | Sent | Filed |
|---|---|---|---|---|---|---|---|
| Mohitmeet Singh, MD | | | In Basket | ECR IP NOTE DETAILS (RICH TEXT) | Jose M. Velasco, MD [4270] | 12/19/2011 | 12/19/2011 |

# NORTH SHORE PAIN CENTER

Steven Blum, M.D., Dickson Wu, M.D., Mihail Beckerman, M.D., Robert L. Barkin, M.B.A., Pharm. D.
9701 Knox Avenue, Suite 103. Skokie, Illinois 60076  (847) 933-6974. Fax (847) 933-6044

Ms. Green has herniated disc at L4-5.
This possibly is related to the MVA.
She had one epidural steroid injection
and will get one more. If this doesn't
work, she may need surgery (microdiscectomy)

11/9/4

# Medical Group

| | | |
|---|---|---|
| Chicago Medical Office<br>2073 North Clybourn Avenue<br>Chicago, IL 60647 | Evanston Medical Building<br>1000 Central Street, Suite 615 and 800<br>Evanston, IL 60201 | Evanston Kellogg Cancer Center<br>2650 Ridge Avenue<br>Evanston, IL 60201 |
| Glenbrook Ambulatory Care Center<br>2180 Pfingsten Road<br>Glenview, IL 60026 | Glenbrook Eye and Vision Center<br>2050 Pfingsten Road, Suite 280<br>Glenview, IL 60026 | Glenview Park Center<br>2400 Chestnut Avenue, Suite A<br>Glenview, IL 60026 |
| Gurnee Ambulatory Care Center<br>7900 Rollins Road Suite 1100<br>Gurnee, IL 60031 | Highland Park Specialty Care Center<br>757 Park Ave West, Suite 2850<br>Highland Park, IL 60035 | Skokie Ambulatory Care Center<br>9650 Gross Point Road, Suite 3900<br>Skokie, IL 60076 |

February 22, 2013

To Whom It May Concern:

RE:     Jennifer S Green
        1/1/1982
        xxx-xx-2985

Jennifer Green has been my patient since July 2003. She is being treated for primary generalized epilepsy.

Please feel free to contact me if I can offer additional information.

Sincerely,

Steven L. Meyers, M.D.
Department of Neurology

A Teaching Affiliate of
the University of Chicago
Pritzker School of Medicine

**Hospitals • Medical Group • Research Institute • Foundation**

## NORTHSHORE UNIVERSITY HEALTHSYSTEM

## NORTHBROOK COURT MEDICAL IMAGING

### DEPARTMENT OF DIAGNOSTIC RADIOLOGY

| | |
|---|---|
| Patient Name: GREEN, JENNIFER | Age: 29 years     Sex: F |
| Medical Record Number: 007312028 | Date of Birth: 1/1/1982 |
| Account Number: 39982472 | |
| Patient Location: MRI NBCR | |

| Accession #: <br> MR-11-0019544 | Procedure Name: <br> MRI Lumbar Spine W/O&W Cont-NBCR | Exam Date <br> 5/23/2011 1:53:03 <br> PM | Ordering Physician: <br> SINGH, <br> MOHITMEET |
|---|---|---|---|

**Results**

Infused MRI of the lumbar spine.

COMPARISON: None.

Clinical data: Lumbago.

FINDINGS:

Sagittal imaging shows normal vertebral body alignment, without listhesis. Vertebral body heights are intact. Degenerative Schmorl's nodes are identified along the inferior endplates of T12 and L4. Bone marrow signal is within normal limits. The intervertebral discs are normal in height and signal. The conus terminates at L2 and is normal in morphology and signal. Post gadolinium imaging shows no pathologic intrathecal enhancement.

L1/L2, L2/L3, L3/L4: Normal.

L4/L5: Mild disc bulge. Small right foraminal disc protrusion. Mild right neuroforaminal narrowing. Minimal left neuroforaminal narrowing. No central spinal stenoses. Mild facet degeneration.

L5/S1: Normal disc. Moderate facet degeneration. No spinal stenoses.

IMPRESSION:

Copies to: SINGH, MOHITMEET

      PHYSICIANS, NOT NORTHSHORE MD

| NORTHSHORE UNIVERSITY HEALTHSYSTEM | NORTHBROOK COURT MEDICAL IMAGING |
|---|---|

## DEPARTMENT OF DIAGNOSTIC RADIOLOGY

**Patient Name:** GREEN, JENNIFER      **Age:** 29 years    **Sex:** F
**Medical Record Number:** 007312028      **Date of Birth:** 1/1/1982
**Account Number:** 39982472
**Patient Location:** MRI NBCR

| Accession #: | Procedure Name: | Exam Date | Ordering Physician: |
|---|---|---|---|
| MR-11-0019544 | MRI Lumbar Spine W/O&W Cont-NBCR | 5/23/2011 1:53:03 PM | SINGH, MOHITMEET |

Small right foraminal disc protrusion at L4/L5.

Mild to moderate facet degeneration in the lower lumbar spine.

FINAL REPORT

Thank you for referring your patient to NorthShore University HealthSystem

Dictated on: 05/23/2011 15:51
Dictating Resident/Fellow/Radiologist: OLSEN, KRISTINA I. MD
Transcribed by: PT 05/23/2011 15:51
Electronically Verified and Signed by: OLSEN, KRISTINA I. MD 05/23/2011 15:55

Copies to: SINGH, MOHITMEET

      PHYSICIANS, NOT NORTHSHORE MD

**Print This Page** | **Close This Window**

Name: Jennifer S Green | DOB: 1/1/1982 | MRN: 007312028 | PCP: MOHITMEET SINGH, MD

## Visit Details

**Glenbrook Emergency Room**
**2100 Pfingsten Road**
**GLENVIEW IL 60025**
**Phone:847-657-5632**
**Fax:847-657-5993**

| Jennifer S Green | Description:31 year old female |
|---|---|
| 1/29/2013  4:24 PM   Hospital Encounter | Department:Glenbrook Emergency Room |

After Visit Summary

### Your Demographic Information

| Date Of Birth | Gender | Race | Ethnicity | Preferred Language |
|---|---|---|---|---|
| 1/1/1982 | Female | Caucasian | Non-Hispanic | English |

### My Reason(s) for Today's Visit
ABDOMINAL PAIN

### Patient Instructions
None

### Goals as of 1/29/13
None

### My To Do List
No orders found for display

### This is a Full List of My Medications

| Medication | |
|---|---|
| Fluconazole (DIFLUCAN) 150 MG PO TABS (Taking) | Take 1 Tab by mouth once for 1 dose. |
| Norco 10, HYDROcodone/APAP 10/325mg, 10-325 MG PO TABS (Taking/Discontinued) | Take 1-2 Tabs by mouth every 6 hours as needed. |
| TraMADol (ULTRAM) 50 MG PO TABS (Taking/Discontinued) | 1 Tab every 6 hours as needed. |
| Fluticasone HFA (FLOVENT HFA) 110 MCG/ACT IN AERO (Taking) | 1 Puff inhale two times per day. |
| Montelukast 10 MG PO TABS (Taking) | Take 1 Tab by mouth every night at bedtime. |
| ClonAZEPAM, Klonopin, 0.5 MG PO TABS (Taking/Discontinued) | TAKE 1 TABLET BY MOUTH EVERY NIGHT AT BEDTIME |
| ZYRTEC PO (Taking) | One tablet every day |
| Albuterol Neb 2.5mg/3ml (0.083%) for PFT (2.5mg/3ml) IN NEBU (Taking) | 3 mL inhale as directed |
| ALBUTEROL IN (Discontinued) | Inhale as needed. |

### We Performed the Following Today
CBC W DIFFERENTIAL [85025 CPT(R)]
CHLAMYDIA/GC BY PCR, GE [87491 Custom]
CULT&GRM STN, VAGINAL [87070 CPT(R)]
ED - BASIC METABOLIC GROUP [80047 CPT(R)]
EXTRA BLUE TUBE 1 [LAB7538 Custom]
EXTRA GREEN TUBE 1 [LAB7535 Custom]
EXTRA LAVENDER TUBE 1 [LAB7532 Custom]
EXTRA SST TUBE 1 [LAB7550 Custom]
TRICHOMONAS PREP,GENITAL [87210 CPT(R)]
URINALYSIS - MACROSCOPIC [81003 CPT(R)]
URINE MICROSCOPIC [LAB6680 Custom]
US DOPPLER ABD/PELVIS/RETRO/SCROTUM LTD [93976 CPT(R)]
US TRANSVAGINAL SCREEN [76830 CPT(R)]

### Today's Immunizations Administered on Date of Encounter - 1/29/2013
None

### Your Vitals Were - Last Recorded

| BP | Pulse | Temp(Src) | Resp | Height | Weight |
|---|---|---|---|---|---|
| 112/65 | 58 | 98.1 °F (36.7 °C) | 18 | 5' 6" (1.676 m) | 140 lb (63.504 kg) |

| BMI | Smoking Status |
|---|---|
| 22.61 kg/m2 | Former Smoker |

## Allergies as of 1/29/2013

Codeine
Other
Pharbedryl
Theophylline

## Results

### EXTRA LAVENDER TUBE 1

| Component |
|---|
| LAVENDER EXTRA TUBE |
| TUBE ON HOLD |

### EXTRA GREEN TUBE 1

| Component |
|---|
| GREEN TOP EXTRA TUBE |
| TUBE ON HOLD |

### EXTRA BLUE TUBE 1

| Component |
|---|
| BLUE TOP EXTRA TUBE |
| TUBE ON HOLD |

### EXTRA SST TUBE 1

| Component |
|---|
| SST EXTRA TUBE |
| TUBE ON HOLD |

### CBC W DIFFERENTIAL

| Component | Value | Standard Range & Units |
|---|---|---|
| WBC | 7.8 | 4.0-10.0 THOU/CU MM |
| RBC | 4.09 | 3.90-5.25 M/UL |
| HEMOGLOBIN | 13.0 | 12.0-15.0 GM/DL |
| HCT | 37.4 | 36.0-45.0 % |
| MCV | 91.5 | 81.0-99.0 CU MICRONS |
| MCH | 31.8 | 27.0-33.0 UUG |
| MCHC | 34.7 | 32.5-36.5 % |
| RDW | 12.0 | 11.6-14.8 % |
| PLATELET COUNT | 211 | 150-400 THOU/CU MM |
| LYMPH% | 21.0 | 12.0-40.0 % |
| MONO% | 6.9 | 4.0-12.0 % |
| NEUT% | 63.6 | 40.0-74.0 % |
| EOSIN% | 7.9 | 0.0-8.0 % |
| BASO% | 0.6 | 0.0-2.0 % |
| ABSOLUTE LYMPH | 1.6 | 1.0-4.0 THOU/CU MM |
| ABSOLUTE MONO | 0.5 | 0.1-0.7 THOU/CU MM |
| ABSOLUTE NEUT | 5.1 | 1.5-8.0 THOU/CU MM |
| ABSOLUTE EOS | 0.6 | 0.0-0.6 THOU/CU MM |
| ABSOLUTE BASO | 0.0 | 0.0-0.2 THOU/CU MM |

### URINALYSIS - MACROSCOPIC

| Component | Value | Standard Range & Units |
|---|---|---|
| COLOR | YELLOW | |
| APPEARANCE | CLEAR | |
| SPECIFIC GRAVITY | 1.015 | 1.005-1.030 |
| PH | 6.0 | 5.0-8.0 |
| PROTEIN | NEGATIVE | NEGATIVE |
| GLUCOSE | NEGATIVE | NEGATIVE GM/DL |
| KETONES | NEGATIVE | NEGATIVE |
| BILIRUBIN, URINE | NEGATIVE | NEGATIVE |
| BLOOD | NEGATIVE | NEGATIVE |
| NITRITE | NEGATIVE | NEGATIVE |
| UROBILINOGEN | 0.2 | 0.1-1.0 EU |

| LEUKOCYTE ESTERASE | NEGATIVE | NEGATIVE |
|---|---|---|

## ED - BASIC METABOLIC GROUP

| Component | Value | Standard Range & Units |
|---|---|---|
| GLUCOSE ISTAT | 93 | 60-99 MG/DL |
| SODIUM ISTAT | 140 | 133-145 MEQ/L |
| POTASSIUM ISTAT | 3.8 | 3.5-5.3 MEQ/L |
| CHLORIDE ISTAT | 102 | 98-108 MEQ/L |
| CO2 ISTAT | 28 | 23-32 MEQ/L |
| BUN ISTAT | 10 | 7-23 MG/DL |
| CREATININE ISTAT | 0.8 | 0.5-1.2 MG/DL |
| CALCIUM IONIZED ISTAT | 1.25 | 1.12-1.23 MMOL/L |

## US DOPPLER ABD/PELVIS/RETRO/SCROTUM LTD

Component
Text

Transvaginal pelvic ultrasound ovarian Doppler

Clinical History: Pelvic pain

Comparison: None

Findings:

Transvaginal pelvic ultrasound only was performed to assess for a cause
of pelvic pain. Doppler of both ovaries was performed to exclude torsion
given pelvic pain.

Uterus measures approximately 7.5 x 3.4 x 4.4 cm. IUD is identified
within the endometrium in the fundus. There are small nabothian cysts
noted in the cervix. There are no endometrial abnormalities. The
endometrium measures 3 mm in thickness. There are no uterine masses.

The left adnexa there is a complex cyst containing septations. The ovary
measures 4.4 x 3.4 x 4.3 cm. The cyst measures 3.6 x 2.7 x 3.9 cm. There
are no mural nodules or areas of internal flow within the cyst.

Doppler evaluation demonstrates arterial and venous waveforms within the
left ovary.

The right ovary measures 3.6 x 2.4 x 2.0 cm. There are no solid or
cystic ovarian lesions. A Doppler evaluation demonstrates normal
arterial and venous waveforms with in the right ovary.

There is no free fluid in the pelvis.

Impression:

1. Complex left adnexal cyst. A followup transvaginal ultrasound in 2 to
3 menstrual cycles is recommended.

2. No evidence of ovarian torsion.

3. IUD in the uterus.

FINAL REPORT

Thank you for referring your patient to NorthShore University
HealthSystem

Dictated on: 01/29/2013 18:07
Dictating Resident/Fellow/Radiologist: GUEST, AMY B.  MD
Transcribed by: PT  01/29/2013 18:07
Electronically Verified and Signed by: GUEST, AMY B.  MD  01/29/2013
18:11

## URINE MICROSCOPIC

**Component**
**URINE MICROSCOPIC**
SEE COMMENT
**Comment:**
Urine microscopic examination not usually
significant when all macroscopic parameters
are normal.

## US TRANSVAGINAL SCREEN

**Component**
**Text**
Transvaginal pelvic ultrasound ovarian Doppler


Clinical History: Pelvic pain


Comparison: None


Findings:


Transvaginal pelvic ultrasound only was performed to assess for a cause
of pelvic pain. Doppler of both ovaries was performed to exclude torsion
given pelvic pain.


Uterus measures approximately 7.5 x 3.4 x 4.4 cm. IUD is identified
within the endometrium in the fundus. There are small nabothian cysts
noted in the cervix. There are no endometrial abnormalities. The
endometrium measures 3 mm in thickness. There are no uterine masses.


The left adnexa there is a complex cyst containing septations. The ovary
measures 4.4 x 3.4 x 4.3 cm. The cyst measures 3.6 x 2.7 x 3.9 cm. There
are no mural nodules or areas of internal flow within the cyst.


Doppler evaluation demonstrates arterial and venous waveforms within the
left ovary.


The right ovary measures 3.6 x 2.4 x 2.0 cm. There are no solid or
cystic ovarian lesions. A Doppler evaluation demonstrates normal
arterial and venous waveforms with in the right ovary.


There is no free fluid in the pelvis.


Impression:


1. Complex left adnexal cyst. A followup transvaginal ultrasound in 2 to
3 menstrual cycles is recommended.

2. No evidence of ovarian torsion.

3. IUD in the uterus.

FINAL REPORT

Thank you for referring your patient to NorthShore University
HealthSystem

Dictated on: 01/29/2013 18:07
Dictating Resident/Fellow/Radiologist: GUEST, AMY B.  MD
Transcribed by: PT  01/29/2013 18:07
Electronically Verified and Signed by: GUEST, AMY B.  MD  01/29/2013
18:11

---

**CHLAMYDIA/GC BY PCR, GE**

| Component | Value | Standard Range & Units |
|---|---|---|
| CHLAMYDIA DNA PCR | NEGATIVE | NEGATIVE |
| N GONORRHOEAE DNA PCR | NEGATIVE | NEGATIVE |

---

**TRICHOMONAS PREP, GENITAL**

Component
TRICHOMONAS/YEAST PREP
See below
Comment:
NEGATIVE:  Wet mount NEGATIVE for Trichomonas and yeast.

---

**CULT&GRM STN, VAGINAL**

Component
CULTURE GENITAL
See below
Comment:
3+ (Moderate) Mixed vaginal flora
No group A or B streptococci isolated
No Neisseria gonorrhoeae isolated.
CULTURE GENITAL
Candida albicans
3+ (Moderate)

---

**Problem List as of 1/29/2013**

TRACHEA/BRONCHUS DIS NEC
Unspecified asthma, with exacerbation
IUD surveillance
Lumbar radiculopathy

**Your Problem List**

Please let your doctor or your doctor's care team know if any items on your problem list are missing or
incorrect.  Some of the problems listed may not have been addressed by your doctor during this visit.

View your test results anywhere, anytime - http://www.northshoreconnect.org/
For additional health resources visit our website at http://www.northshore.org/health-resources/

MyChart® licensed from Epic Systems Corporation, © 1999 - 2012. Patents pending.

 **NorthShore**
University HealthSystem

**SKOKIE HOSPITAL ED**
9600 GROSS POINT ROAD
SKOKIE IL 60077
Phone: 847-933-6950

**Green, Jennifer S**
MRN# 007312028

Department: **SKOKIE HOSPITAL ED**
ED Visit Date: **5/24/13**

You were seen by Skinner, Jeffrey A., MD and Hart, Sari L., MD.

**Diagnosis**

Ovarian cyst

**Your Discharge & Follow Up Instructions Are:**

**Use Motrin according to package instructions for pain as needed.**

**Make appointment to see your obstetrician gynecologist next week.**

**Return if fever, severe vomiting, uncontrollable pain**

**Follow-up Information**

| Follow up With | Details | Comments | Contact Info |
|---|---|---|---|
| Singh, Mohitmeet, MD | | | |

**WHEN CALLING THE DOCTOR'S OFFICE FOR A FOLLOW UP APPOINTMENT, PLEASE MENTION YOU WERE SEEN IN THE EMERGENCY DEPARTMENT.**

**These are your medications prescribed today:**

None

Medications reported taking as of 05/24/2013

**ClonAZEPAM (Klonopin) Dose:** 1 Tab **Route:** Oral **Frequency:** 1 Tab every night at bedtime.

**Topiramate Sprinkle Cap Dose:** 25 mg **Route:** Oral **Frequency:** Take 1 Cap by mouth two times per day.

**TraMADol Dose:** 100 mg **Route:** Oral **Frequency:** 2 Tabs every 6 hours as needed.

**Fluticasone HFA Dose:** 1 Puff **Route:** Inhalation **Frequency:** 1 Puff inhale two times per day.

**Montelukast Dose:** 1 Tab **Route:** Oral **Frequency:** Take 1 Tab by mouth every night at bedtime.

**ALBUTEROL IN Dose:** **Route:** Inhalation **Frequency:** inhale as needed.

**ZYRTEC Dose:** **Route:** Oral **Frequency:** One tablet every day

**Albuterol Neb 2.5mg/3ml (0.083%) for PFT Dose:** 2.5 mg **Route:** Inhalation **Frequency:** 3 mL inhale as directed

**THE ABOVE LIST CONTAINS MEDICATIONS THAT YOU ARE CURRENTLY TAKING BASED ON INFORMATION YOU PROVIDED TO THE EMERGENCY DEPARTMENT STAFF. IF YOU HAVE ANY QUESTIONS ABOUT ANY OF THESE MEDICATIONS, PLEASE CONTACT YOUR PRIMARY CARE PHYSICIAN.**

**VERBALIZED UNDERSTANDING OF DISCHARGE INSTRUCTIONS AND COPY GIVEN.**

You may receive a brief survey on the telephone or in the mail asking you to tell us about your NorthShore University HealthSystem experience. Please take a few minutes to share your opinions with us. Your feedback is greatly appreciated.
Thank You.

Green, Jennifer S

## Results

US TRANSVAGINAL SCREEN (Order 222398620)

### Patient Information

| | | |
|---|---|---|
| Patient Name | Sex | DOB |
| Green, Jennifer S | Female | 1/1/1982 |

### Lab Information

Lab
TEST LAB
  Resulting Physician: SPEAR, GEORGIA GIAKOUMIS

### PACS Report

Click here for detailed report or images for US
TRANSVAGINAL SCREEN

### Entry Date

5/24/2013

### Component Results

**Text:**

CLINICAL HISTORY: Abdominal pain.  Last menstrual period 05/17/2013.
Gravida 1, para 0.  IUD in place.

The patient reports focal pain in the right inguinal region.  She had
prior hernia repair in 2012.

COMPARISON: 04/10/2013.

TECHNIQUE: Transabdominal and transvaginal pelvic ultrasound was
performed.

FINDINGS:

An IUD is in place.  The uterus measures 7.4 x 3.7 x 3.4 cm.  The
endometrial stripe measures 3 mm.  This is within normal limits.

The right ovary measures 4.9 x 2.9 x 1.9 cm.  Within the right ovary,
there is a 1.7 x 1.5 x 1.3 cm cyst.  The left ovary measures 2.7 x 3.1 x
2.6 cm.  Within the left ovary, there is a 7 x 6 x 5 mm echogenic
structure that likely represents an involuting corpus luteum cyst.

No pelvic free fluid is identified.

Sonographic evaluation of the area of pain in the right inguinal region
demonstrates shadowing from prior mesh placement.  No suspicious
sonographic findings are identified.

IMPRESSION:

1. 1.7 cm cyst versus dominant follicle in the right ovary.

2. IUD in place.

3. No sonographic abnormality in the area of pain over the right
inguinal region.  Correlation with clinical scenario is recommended.

This exam was dictated at Glenbrook Hospital.

FINAL REPORT

Thank you for referring your patient to NorthShore University
HealthSystem

Dictated on: 05/24/2013 17:21
Dictating Resident/Fellow/Radiologist: SPEAR, GEORGIA GIAKOUMIS  MD
Transcribed by: PT  05/24/2013 17:21
Electronically Verified and Signed by: SPEAR, GEORGIA GIAKOUMIS  MD
05/24/2013 17:31

**Lab and Collection**
US TRANSVAGINAL SCREEN (Order #222398620) on 5/24/2013 - Lab and Collection Information

**Result History**
US TRANSVAGINAL SCREEN (Order#222398620) on 5/24/13 - Order Result History Report.

**Result Information**

| Status | Provider Status |
|---|---|
| **Final result (5/24/2013 5:37 PM)** | Ordered |

**NorthShoreConnect Status:**
This result is currently not released to NorthShoreConnect through MyChart.

## Order

**US TRANSVAGINL SCREEN (NON-OB) [A0372235] (Order 222398620)**

**Patient Information**

| Patient Name | Sex | DOB |
|---|---|---|
| Green, Jennifer S | Female | 1/1/1982 |

**Result Information**

Status
**Final result (5/24/2013 5:37 PM)**
Provider Status: Ordered

**Order Information**

| Order Date/Time | Release Date/Time | Start Date/Time | End Date/Time |
|---|---|---|---|
| **5/24/2013  4:19 PM** | **5/24/2013  4:19 PM** | **5/24/2013  4:30 PM** | **5/24/2013  4:30 PM** |

**Provider Information**

Ordering User
**Liontis, Electra, RN**
  Ordering Provider: **Hart, Sari L., MD**
  Authorizing Provider: **Hart, Sari L., MD**

Attending Provider(s)
**Skinner, Jeffrey A., MD**
  PCP: **Singh, Mohitmeet, MD**
  Billing Provider: **Spear, Georgia Giakoumis, MD**
**Hart, Sari L., MD**

**Order Information**

| Date | Released By |
|---|---|
| 5/24/2013 | **Liontis, Electra, RN** |

  Authorizing: **Hart, Sari L., MD**
  Department: **Sk Emergency Room**

**Comments**
SER: SK EXAM 08-08